## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 23-521-1 |
| TARIQ BENNETT | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

Over the course of approximately two years, defendant Tariq Bennett, along with his co-defendants Syheed Goodman and Michael Colbert, participated in a scheme to steal at least 46 vehicles from rental car locations, car dealerships and home improvement/tractor supply stores in and around Pennsylvania. As part of the scheme, the defendants obtained the personal identifying information of third-party victims predominately by purchasing stolen personal identifying information from online platforms. Defendant Goodman then used this information to create fabricated driver's licenses. The defendants used these fabricated licenses to steal vehicles by test driving, renting and even purchasing the vehicles. The test-driven and rented vehicles were never returned; no payments were ever made on the "purchased" vehicles. The defendant's participation in this conspiracy – including the length and sophistication of the scheme, as well as the breadth of the defendant's participation – warrants a substantial period of incarceration.

For these reasons, as well as for the reasons provided below, the government recommends a sentence of incarceration within the advisory guideline range of 41 months to 51 months imprisonment, with an additional two-year mandatory sentence to run consecutive to any other sentence, absent any basis for a below-guideline sentence addressed in the supplemental sealed attachment to this sentencing memorandum.

A sentencing court follows a two-step process, first calculating the range under the Sentencing Guidelines, and then considering that range along with all pertinent 18 U.S.C. § 3553(a) factors in determining the appropriate sentence. *See* USSG § 1B1.1 (Nov. 1, 2025).[1]

At the second step of the sentencing process, "[t]he record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted). *See also Rita v. United States*, 551 U.S. 338, 356 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority."); *United States v. Flores-Mejia*, 759 F.3d 253, 256 (3d Cir. 2014) (en banc) ("Failure to give 'meaningful consideration' to any such argument renders a sentence procedurally unreasonable which, when appealed, generally requires a remand for resentencing.").

The government explains below its view of the proper consideration in this case of the advisory guideline range and of the Section 3553(a) factors.

## I.    **BACKGROUND**

On December 14, 2023, a grand jury returned an eleven-count Indictment charging the defendant and Michael Byard Colbert with six counts of wire fraud, in violation of 18 U.S.C.

---

[1]  Courts previously followed a three-step process, in which the court first calculated the guideline range, then next ruled on motions for departure, before considering the 3553(a) factors. *See United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006). In an extensive amendment to the Guidelines effective November 1, 2025, the Sentencing Commission eliminated the departure provisions in the manual and dictated the two-step process described above.

§ 1343. The defendant was also charged with two counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A; and one count of transportation of a stolen vehicle, in violation of 18 U.S.C. § 2312.

On June 13, 2024, the grand jury returned a 31-count Superseding Indictment charging the defendant and Michael Colbert, as well as defendant Syheed Goodman. Defendants Bennett, Colbert, and Goodman were each charged with one count of conspiracy, in violation of 18 U.S.C. § 371 (Count 1); and 16 counts of wire fraud, in violation of 18 U.S.C. § 1343 (Counts 2 through 17). Defendant Bennett was charged with nine additional counts: five counts of aggravated identity theft and aiding and abetting aggravated identity theft, in violation of 18 U.S.C. §§ 1028A(a)(1), (c)(5) and 2 (Counts 18, 19, 20, 22 and 23); and four counts of transportation of a stolen vehicle and aiding and abetting the transportation of a stolen vehicle, in violation of 18 U.S.C. §§ 2312 and 2 (Counts 27, 29, 30 and 31).

The defendant was arrested on December 22, 2023. On April 15, 2025, the defendant appeared before the Honorable Chief Judge Mitchell S. Goldberg, United States District Court Judge for the Easter District of Pennsylvania, and pled guilty, without a plea agreement, to Counts 1 through 20, 22, 23, 27, and 29 through 31 of the Superseding Indictment. During his colloquy, the defendant admitted to his role in the conspiracy, including his creation of the fabricated drivers used throughout the conspiracy and his personal involvement in the thefts at least 43 of the 46 vehicles.

## II.    SENTENCING CALCULATION

### A.    Statutory Maximum Sentence.

The maximum sentence that may be imposed on the defendant is a term of imprisonment of 375 years, a term of supervised release of 3 years, a fine of $6,500,000, and a special

assessment of $2,600. There is a mandatory minimum term of imprisonment of 2 years consecutive to any other count (unless it is a count under Section 1028, pursuant to 1028A(b)(2)), on Counts 18, 19, 20, 22 and 23.

**B.      Sentencing Guidelines Calculation.**

The Probation Office correctly calculated the defendant's advisory guideline range as follows: The 2025 U.S. Sentencing Guidelines Manual is the applicable manual for purposes of calculating the guidelines. PSR at ¶71. Counts 1 through 17, 27, 29 through 31 group pursuant to USSG §3D1.2(d) because the offense level is determined largely on the basis of the total amount of harm or loss. PSR at ¶73. Specifically, pursuant to Application Note 4 of USSG § 3D1.2, Count 1, charging conspiracy, groups with Counts 2 through 17, 27, 29 through 31, which charge the substantive offenses that were the sole object of the conspiracy charge. *Id.* Counts 18 through 20, 22 and 23 are excluded from grouping pursuant to USSG §3D1.1(b)(1) because they carry mandatory terms of imprisonment that must be imposed to run consecutively to any other term of imprisonment. PSR at ¶74.

Under USSG §2B1.1(a)(1), the base offense level for the defendant's conduct is 7 because the defendant was convicted of an offense referenced to this guideline and that offense of conviction has a statutory maximum term of imprisonment of 20 years or more (Counts 2-17). PSR at ¶75. Under USSG §2B1.1(b)(1)(H), the actual fraud loss caused in furtherance of the criminal activity jointly undertaken by the defendant and his co-schemers for which the defendant is responsible was at least $1,383,237.14. Because this amount is greater than $550,000 but less than $1,500,000, the base offense level is increased by 14 levels. PSR at ¶76. Because the offenses involved more than 10 victims, the offense level is increased by 2 levels under USSG §2B1.1(b)(2)(A)(i). PSR at ¶77.

Because the defendant has pled guilty to Counts 18, 19, 20, 22 and 23, which results in a mandatory, consecutive two-year term of imprisonment, the defendant's offense level is not subject to the two-level increase pursuant to USSG §2B1.1(b)(11)(C)(i) even though the offense involved the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification (USSG §2B1.6, Application Note 2). PSR at ¶78. The offenses involved an organized scheme to steal or receive stolen vehicles, so the offense level is increased by 2 levels pursuant to USSG §2B1.1(b)(15)(A). PSR at ¶79.

The defendant had demonstrated acceptance of responsibility for his offense, making the defendant eligible for a 2-level downward adjustment, pursuant to USSG §3El.l(a). PSR at ¶85. Finally, the defendant had assisted authorities in the investigation or prosecution of his own misconduct by timely notifying the government of his intent to plead guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the Court to allocate their resources efficiently, resulting in a 1-level downward adjustment, pursuant to USSG §3E1.1(b). PSR at ¶86.

The defendant's Total Offense Level is 22. PSR at ¶87. The defendant has one criminal history point, which establishes a criminal history category of I. PSR at ¶91. Based on the foregoing, the defendant's guideline imprisonment range is 41 to 51 months, with a mandatory two-year sentence for each of Counts 18 through 20, 22, and 23 to run consecutive to any sentence. PSR at ¶139. The terms of imprisonment pursuant to 18 U.S.C. § 1028A may run concurrently or consecutively to one another. PSR at ¶137; 18 U.S.C. § 1028A(b)(4).[2] The

---

[2] In exercising its discretion in determining whether to run these sentences concurrently or consecutively, the Court should "consider 'applicable guidelines and policy statements issued
*continued . . .*

defendant's total guideline range is therefore 65 months to 171 months, depending on whether the five mandatory two-year sentences run consecutively or concurrently to one another. PSR at ¶132.

## III.    ANALYSIS

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). "These requirements mean that '[i]n the usual sentencing, . . . the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range." *Peugh v. United States*, 569 U.S. 530, 542 (2013) (quoting *Freeman v. United States*, 564 U.S. 522, 529 (2011) (plurality opinion); ellipsis in original). "Common sense indicates that in general, this system will steer district courts to more within-Guidelines sentences." *Peugh*, 569 U.S. at 543. "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id.* at 544.

In addition, this Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner;

---

by the Sentencing Commission' and make a record of the factors considered." *United States v. Smith*, 401 F. App'x 671, 672 (3d Cir. 2010) (internal citation omitted).

(5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

### A.    <u>Consideration of the 3553(a) Factors Regarding Imprisonment</u>.

For the reasons outlined below, the government is seeking a sentence consistent with all the factors under Section 3553(a) and specifically requests a sentence within the guideline range, with Counts 18 through 20, 22, and 23 for violations of 18 U.S.C. § 1028A to run concurrently.

#### 1.    <u>The nature and circumstances of the offense and the history and characteristics of the defendant</u>

The defendant's offenses were not only serious, but they were well thought out and carried out over the course of multiple years. The defendant personally used knowingly fabricated driver's licenses to test drive, fraudulently purchase and rent vehicles for the purpose of stealing these vehicles. The defendants took advantage of the car rental and car dealership companies' pandemic-era policies to facilitate their thefts, including by wearing masks into rental locations and dealerships to obscure their identities, and exploiting the relaxed policies on employees accompanying customers during test drives. Notably, of the 46 identified thefts, the defendant personally participated in at least 43. The defendant appears to have committed 16 of these thefts on his own (with the assistance of the fabricated driver's licenses).

While in some instances the transactions were quickly flagged as fraudulent, in others the fraudulent nature was only identified after victims were contacted by creditors and/or police. One victim (G.M.) had to pay approximately $1,600 out of pocket to avoid the fraud affecting his credit, several victims (J.M. and K.S.) suffered adverse effects to their credit, and at least one

victim (P.D.) had to hire an attorney to respond to collection efforts. Corporate victims, including the dealerships and rental locations, ultimately had to bear hundreds of thousands of dollars in losses from the thefts. While some were made whole or partially whole through insurance claims, widespread theft that like that carried out by the defendants can materially affect the cost of vehicles in a community to offset loss amounts and higher insurance premiums.

Consideration of the nature of the offenses therefore counsels in favor of the guideline sentence.

2.      The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense and the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant

The defendant's history also supports the need for a guideline sentence. While Bennett had only one criminal conviction prior to his arrest in the present case, his actions support that there is a strong need to afford adequate deterrence and to protect the public. With respect to the present offense, as discussed above, the defendant carried out the criminal activity over the course of approximately two years. Unfortunately, the defendant's actions in the present case were not an isolated incident. The record supports that the defendant was involved in, or at least attempted to participate in, a multitude of schemes during this period of time including smaller schemes like purchasing and dealing in fraudulent handicap passes, to larger ones including stealing and cashing checks from the mail and opening bank accounts in the names of third-party victims for the purpose of overdrawing them.

### i. Handicap Passes

Text messages between Bennett and Goodman[3] support that Bennett was purchasing fraudulent handicap passes from Goodman from at least August 2022 through September 2023. For instance, on August 13, 2022, Goodman confirmed to Bennett via text message that he had handicap passes available for $80:

| | |
|---|---|
| Bennett: | Got a handicap trap for you.. $80 still? |
| Goodman: | Yessir |

Several months later, on December 9, 2022, Bennett ordered 2 passes from him:

| | |
|---|---|
| Bennett: | Need 2 handicaps .. |
| Goodman: | Way |
| Bennett: | Be out like 7/8 |
| Bennett: | Call you |
| Goodman: | Bet |

Approximately 10 months later, on September 4, 2023, Bennett asked Goodman to make him another handicap pass:

| | |
|---|---|
| Bennett: | When you get home make some handicaps,, you got a trap.. |
| Goodman: | How many |
| … | |
| Bennett: | One asked so far… |
| Goodman: | Ok bet |

### ii. Check Theft Scheme

Text messages between Bennett and Goodman in April and May 2023 support that they were attempting to use Bennett's contact within the mail service to identify, steal and cash tax refund and treasury checks. For instance, on April 6, 2023, Goodman texted Bennett about Bennett's contact within the mail service. In the messages, Goodman suggests that they have the

---

[3] Unless otherwise indicated, the messages quoted in this memorandum were obtained from Bennett's iCloud, produced by Apple Inc. via search warrant on March 13, 2024.

mail contact steal tax refund checks, then Goodman and Bennett would open bank accounts for

the purpose of cashing the checks, and remit a portion of the proceeds to Bennett's mail contact

for his participation.

| | |
|---|---|
| Goodman: | See if your mail man bul come across any treasury checks |
| Goodman: | Tax Refund jawns |
| Goodman: | We can crack them easy |
| Goodman: | And they clear the next day |
| Goodman: | Open account and drop it |
| Goodman: | We pay him a G off it and me and you bust it down |

Approximately a month later, on May 11, 2023, Bennett identified a specific check,

belonging to E.P. who lived on Chew Ave,[4] and discussed with Goodman how they could make

a fabricated driver's license using the woman's personal identifying information and cash the

check themselves:

| | |
|---|---|
| Bennett: | E. P. 1___ w chew Ave |
| Bennett: | Get her shyt.. we can bust this 859 check .. down the middle |
| Goodman: | Bet |
| Bennett: | Bro, we can make eyes[5] and Cash it on 46 chestnut… he'll take that.. with A utility Bill |
| Goodman: | Bet. I'm waiting on the info |
| Bennett: | I'm grabbing the other jawns from mail man today too |
| Goodman: | She 49 |
| Goodman: | It's a treasury? |
| Bennett: | City refund check .. |
| Goodman: | Who we going to send in? |
| Bennett: | E. couldddd be a dude mama |
| Bennett: | Name* |
| Goodman: | I'm redoing the jersey too. I found the flaws in ours |
| Bennett: | What you think?? |
| Goodman: | I'm down |

---

[4] The defendants identified the victim by first and last name, and had a complete street address for her. This information has been redacted to protect the identity of the victim.
[5] Slang for fabricated identifications.

- 10 -

### iii.    Bank Account Scheme

About a week after the above messages, on May 20, 2023, Bennett and Goodman attempted to open up a bank account at Citizens Bank in the name of a CHOP employee for the purpose of overdrawing the account. In the below messages, Goodman reminds Bennett the day before the planned fraud to bring scrubs to play the part of the CHOP employee:

| Bennett: | We at it in da am |
|---|---|
| … | |
| Goodman: | Rd we good we got a bul |
| Goodman: | Bring your scrubs out too |
| … | |
| Bennett: | I forgot to hit you |
| Goodman: | Just meet me at citizens |
| Bennett: | South street Jawn |
| … | |
| Bennett: | On my way downtown |
| Goodman: | I'm getting dressed |
| Bennett: | I'm at 10 n Lehigh Jawn.. walking in now |

Police reports indicate that Bennett was arrested that day, May 20, 2023, at the Citizens Bank at 1025 W Lehigh Ave., Philadelphia, PA, while attempting to open a bank account to withdraw money using a fraudulent Pennsylvania Identification Card in the name "J.W." along with a CHOP employee card with the same name.[6] Notably, the police report indicates that Bennett was dressed in scrubs – consistent with Goodman's request, above.

Within a few days of this arrest, Bennett and Goodman had resumed their fraudulent activity. Just five days later, on May 25, 2023, they had the following exchange about stealing rental cars from Avis:

| Bennett: | N niggaaa,, I called a few Avis too,, they still allowing the swipe for transactions.. we grab them easy |
|---|---|

---

[6] Records indicate that these charges were dismissed on September 1, 2023. PSR at ¶98. Goodman was not arrested in that incident.

Goodman:      Car rental?
Bennett:      Yeaa
....
Goodman:      I been making eyes[7] since like 8
Goodman:      I'm almost done

The first charged theft from Home Depot occurred days later on June 5, 2023.

In sum, Bennett's conduct here was not an isolated instance of fraudulent activity into which he innocently stumbled. As discussed below, while there are some circumstances that mitigate the defendant's actions, the totality of the circumstances support that a substantial prison sentence is necessary here.

The defendant's background supports that his criminal activity is largely inconsistent with his family history, support system and education. The defendant was predominately raised by his mother. PSR at ¶103. While the defendant's mother provided for his material and emotional needs, the defendant was raised in West Philadelphia in an area that was both "violent and riddled with substance abuse." *Id.* The defendant also struggled with the absence of his father. Despite these challenges, the defendant attended and graduated high school from the Milton Hershey School, after which he obtained a college degree from Penn State University. PSR at ¶¶107, 119, 120. Based on publicly available information, the defendant appears to have played basketball while attending Penn State.

The defendant's employment history is spotty. He was employed with the Urban Affairs Commission in Philadelphia from June 13, 2018, through August 17, 2018. PSR at ¶127. His next documented employment was almost two years later as a food service director from January to March 2020 with Youth Enrichment Programs. PSR at ¶126. The defendant reported driving

---

[7] Slang for fabricated identifications.

for Uber and DoorDash in 2021 and 2022. PSR at ¶125. There is no other employment reported during the course of the conspiracy from October 2021 through October 2023. Following his arrest on December 22, 2023, the defendant worked as an Amazon Delivery Service Partner for "two to three" months in the first quarter of 2024. PSR at ¶124. Since May 2024, the defendant reports to have been employed by Budget Approved Transportation, a Philadelphia-based trucking company. PSR at ¶122. Notably, Bennett's mother, with whom he currently resides, was not aware of his purported employment with Budget Approved Transportation. PSR at ¶¶109, 122 n.15.

During his Presentence Investigation interview, the defendant stated that he "takes accountability for everything." PSR at ¶68. The defendant reported to that his participation in the criminal conspiracy was a result of both financial struggles and wanting "quick money" to open up a bar. PSR at ¶68. The defendant further stated that he was motivated to carry out the fraudulent activity because he "wanted to be in" – an admission made in reference to displays of cash and vacations posted on Instagram. PSR at ¶68. The defendant referenced the loss of his job during Covid as a contributing factor, but based upon his employment history the defendant's only reported employment since August 2018, apart from Uber and DoorDash, was the three-month long position with Youth Enrichment Programs from January to March 2020. PSR at ¶126. The first vehicle theft identified in the Superseding Indictment occurred on October 20, 2021 – approximately 18 months later. PSR at ¶14.

The defendant also partially attributed his participation in the criminal conspiracy to his alcoholism as well as a gambling problem. PSR at ¶¶68, 116. Notably, while the defendant self-reported his alcohol abuse, his mother – with whom he resides – did not mention any substance abuse concerns. PSR at ¶¶107, 118.

In sum, the defendant's history provides both mitigating and aggravating factors. The defendant faced challenges in his early years, including an absent father and a violent neighborhood. He reports to have faced alcoholism as well as gambling issues as an adult, both of which the defendant identified as contributing to his criminal behavior. The defendant, like many individuals, reports employment loss and financial stress during the Covid pandemic. He has a young son for whom he has shared custody and for whom he provides material support. These factors, at best, weigh in favor of a sentence of imprisonment at the lower end of the guidelines, but they certainly do not outweigh the gravity and duration of the offense.

There are several factors that weigh strongly in favor of a significant period of incarceration notwithstanding some arguably mitigating circumstances. While the defendant faced some struggles in his early years, the defendant was ultimately accepted into the elite Milton Hershey School from which he obtained a high school diploma. He attended and graduated from Penn State University, where he was also a college athlete. In addition to being a college graduate, the defendant had no criminal history through November 2023 (age 28). Despite this, he has had only intermittent gainful employment since his graduation from college in 2018, and for the period of the charged conspiracy appears to have had no other substantial source of income. While the defendant attributes his criminal behavior in part to addiction and gambling, he concedes that he was also motivated by a desire to quickly obtain money so that he could open a bar and to support the appearance of a luxury lifestyle. As discussed at length above, the record supports that the defendant was involved in, or at least attempted to participate in, multiple other fraudulent schemes during this same period.

Moreover, though the defendant has stated that he takes responsibility for his actions, there are troubling inconsistencies in the information he provided to Probation including his self-

- 14 -

reported alcoholism (which was not supported by information provided by his mother and appears inconsistent with the practical obligations of executing the criminal conspiracy with which he has been charged), his claim that he was motivated by financial struggles after having lost his job during Covid (while his employment history supports he had only been employed for 3 months between August 2018 and March 2020), and his assertion that he has been working for Budget Approved Transportation since May 2024 (an account not supported by his mother and for which he could not produce any supporting pay stubs).

Based on the totality of the defendant's history, a guideline sentence is appropriate.

3.      The guidelines and policy statements issued by the Sentencing Commission and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct

In addition, adherence to the recommended guideline range assures that the defendant's sentence is consistent with those imposed nationwide on similarly situated offenders, and thus complying with Section 3553(a)(6) and avoiding undue disparity.

4.      The need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner

There is no need in this case to adjust the sentence in order "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . ." § 3553(a)(2)(D).

5.      The need to provide restitution to any victims of the offense

A guideline sentence is consistent with the need to adequately punish the defendant, while also recognizing the import of allowing the defendant to return to work to facilitate the payment of restitution to the many victims in this case. Restitution in the amount of $939,295.48

shall be ordered as to the defendant. PSR at ¶147.

**B.     Supervised Release.**

Pursuant to Sections 5D1.1 and 5D1.2 of the Sentencing Guidelines, as amended effective November 1, 2025, the Court is directed to conduct an "individualized assessment" when deciding whether to impose a term of supervised release, and if supervised release is imposed, how long the term should be. The Court is further directed to state in open court its reasons for imposing or not imposing a term of supervised release, and its reasons for the length of a term imposed. Further, Section 5D1.3 sets forth mandatory conditions of a term of supervised release, and "discretionary conditions" that the Court may impose, following the same individualized assessment.

The guideline commentary, consistent with 18 U.S.C. § 3583(c), provides that the "individualized assessment" should rest on consideration of the same sentencing factors under 18 U.S.C. § 3553(a) that are considered with respect to a term of imprisonment, with the exception of Sections 3553(a)(2)(A) (the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense") and 3553(a)(3) ("the kinds of sentences available"), which do not apply with regard to supervised release decisions.

In this case, a term of supervised release of at least 3 years is warranted. As explained above, the defendant's criminal record is not consistent with his actual criminal history. The record supports that the defendant was involved in multiple other fraudulent schemes for which he was not arrested including theft, or at least attempted theft, of checks from the mail and the purchasing and distribution of handicap passes. The defendant will also be ordered to pay a

- 17 -

substantial amount of restitution, which warrants a longer period of supervised to ensure employment and repayment.

Close supervision following release from imprisonment is warranted to aid his reentry to society and to protect the public. A term of supervised release in this case advances the goals of sentencing to deter criminal conduct, § 3553(a)(2)(B), protect the public, § 3553(a)(2)(C), assure that the defendant continues to pursue education and vocational efforts that promote rehabilitation, § 3553(a)(2)(D), and pays restitution to victims, § 3553(a)(7). Further, the Sentencing Commission recognizes that "the more serious the defendant's criminal history, the greater the need for supervised release." § 5D1.1 app. note 2. The Commission adds: "In a case in which a defendant sentenced to imprisonment is an abuser of controlled substances or alcohol, it is highly recommended that a term of supervised release also be imposed." § 5D1.1 app. note 3.

This assessment also supports imposition of all of the mandatory and standard conditions of supervised release listed in Section 5D1.3.

## IV.     CONCLUSION

For these reasons and subject to any that may be presented at the defendant's sentencing hearing and in the Sealed Supplement, the government believes that a guideline sentence, with an

additional two-year mandatory sentence to run consecutive to any other sentence, that accounts

for the scope and severity of the defendant's criminal conduct is appropriate in this case.

Respectfully submitted,

DAVID METCALF
United States Attorney

*/s Meghan Claiborne Bisio*
MEGHAN CLAIBORNE BISIO
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that this Sentencing Memorandum has been served on the Filing User

identified below through the Electronic Case Filing (ECF) system:

Mark Wilson, Esq.
Mark_Wilson@fd.org
*Attorney for Defendant Tariq Bennett*

*/s Meghan Claiborne Bisio*
MEGHAN CLAIBORNE BISIO
Assistant United States Attorney

DATED:  April 21, 2026.